MICHAEL C. SALVI vs. SUFFOLK COUNTY SHERIFF'S
DEPARTMENT.

No. 05-P-1047.

Suffolk. May 5, 2006. - October 20, 2006.

Present: GRASSO, COWIN, & KAFKER, JJ.

*Employment,* Discrimination, Sexual harassment, Constructive discharge.
*Practice, Civil,* Instructions to jury, Interest. *Judgment,* Interest. *Damages,*
Back pay, Emotional distress, Punitive. *Interest.*

Where evidence at an employment discrimination trial was sufficient to
demonstrate that the plaintiff employee was subjected to a hostile work
environment on the basis of his sexual orientation, in violation of G. L.
c. 151B, § 4, the trial judge properly denied the defendant's motions for a
directed verdict and for judgment notwithstanding the verdict on that
claim. [603-606]
A Superior Court judge properly denied a defendant's motions for a directed
verdict and for judgment notwithstanding the verdict on a constructive
discharge claim, where the jury was presented with sufficient evidence of
the plaintiff's intolerable working conditions. [606-607]
The defendant in a constructive discharge action waived its objections to jury
instructions and the special verdict form by not presenting such objections
to the trial judge. [607-608]
This court reinstated an award of prejudgment interest on compensatory dam-
ages in a G. L. c. 151B case against a public sector employer, where
sovereign immunity was no bar to the liability of such an employer for
such interest [608]; however, this court declined to reinstate an award of
prejudgment interest on the plaintiff's front pay and punitive damages
awards, which had a purpose beyond restoring to a plaintiff what should
have been his [608-609].
This court confirmed that the appropriate rate at which to calculate prejudg-
ment interest on compensatory damages in G. L. c. 151B actions is twelve
percent per annum, as prescribed by G. L. c. 231, § 6B [609-610]; further,
the effective date for the accrual of such interest is the date that the plaintiff
initiated suit in the Superior Court, and not the date that the plaintiff filed
a complaint with the Massachusetts Commission Against Discrimination
[610].

CIVIL ACTION commenced in the Superior Court Department on
July 27, 2000.

The case was tried before *Catherine A. White, J.*

*Ellen M. Caulo* for the defendant.

*Robert R. Berluti* for the plaintiff.

KAFKER, J. The jury were warranted in making the following findings. Despite the desire of the plaintiff, Michael C. Salvi, to keep his sexual orientation private at work, rumors that he was homosexual spread through the Suffolk County sheriff's department (department) in late 1997 or early 1998. Beginning at that time, the plaintiff heard derogatory comments about homosexuals and learned that he had been referred to as a "fucking fag" by coworkers and by his commanding officer. His coworkers snickered and called him "sissy" at roll call. He felt shunned in the prison cafeteria. Children's toy blocks spelling "FAG" were sent anonymously to the home the plaintiff shared with his domestic partner. The plaintiff complained about the comments unsuccessfully, and after he had complained, he felt that his work assignments significantly worsened. He then sought therapeutic help for job-related stress and depression. Although the slurs and derogatory comments abated by the end of 1998, the rumors and his problems at work did not. After he felt he was unfairly disciplined in October of 1999, he attempted suicide by jumping off the Neponset River bridge. The day after his suicide attempt, the plaintiff went on medical leave, never to return to work.

The plaintiff brought suit in the Superior Court, claiming he was a victim of employment discrimination due to his sexual orientation. More specifically, he claimed that he was subjected to a hostile work environment in violation of G. L. c. 151B, § 4; that the department retaliated against him in violation of G. L. c. 151B, § 4(4), (4A); and that ultimately he was constructively discharged.

The trial lasted eight days. The department moved unsuccessfully for a directed verdict at the close of the plaintiff's case and at the close of the evidence. The jury found, by special verdicts, that the plaintiff had been "subjected to unwelcome, severe or pervasive conduct by the Defendant, . . . based on his sexual orientation that unreasonably interfered with the conditions of Mr. Salvi's employment by creating a hostile, intimidating, or humiliating work environment," and that the

department did "know or have reason to know of the hostile environment" but "fail[ed] to take adequate steps to remedy it." The jury further found that the department did not "retaliate against Mr. Salvi by taking an adverse job action against him because he made complaints of harassment based on his sexual orientation."[1] The jury awarded the plaintiff compensatory damages totaling $93,600 in back pay, $380,000 in front pay, and $50,000 for emotional distress, as well as $100,000 in punitive damages. Thereafter the trial judge entered judgment for the plaintiff in the amount of $623,600 with interest from July 20, 2000, plus costs.

The department moved for judgment notwithstanding the verdict, for a remittitur, or, in the alternative, for a new trial. The trial judge denied this motion on all bases but one, vacating the award of prejudgment interest on the verdict. An amended judgment[2] that deleted the award of prejudgment interest entered. On his cross appeal, the plaintiff asks that prejudgment interest be reinstated, while on its appeal the department argues that the evidence was insufficient to support the special verdicts and damage awards. Specifically, the department maintains that the trial judge erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict on the claims for both sexual harassment and constructive discharge. The department also urges that the instructions on constructive discharge and the omission of a special verdict question on constructive discharge were error.

*Factual background.* In reviewing the denial of a motion for judgment notwithstanding the verdict, we view the evidence presented in the light most favorable to the plaintiff and disregard the evidence favorable to the defendant. *Smith* v. *Bell Atl.*, 63 Mass. App. Ct. 702, 711 (2005). In accordance with that standard, the facts are as follows. The plaintiff is a homosexual male. He began working for the department as a correction officer at the Suffolk County house of correction (South Bay) in 1994. He did not inform his coworkers of his sexual orientation

---

[1]The allegation of constructive discharge was not independently addressed on the special verdict form.

[2]Attorney's fees and costs in the amount of $99,316.60 were also awarded in the amended judgment.

as he considered it a private matter. In late 1997, the plaintiff learned that rumors of his sexual orientation had been circulating in the workplace, apparently having been spread by a coworker named James O'Brien, who was a vice-president of the union.

Soon thereafter, in February of 1998, the plaintiff was at a bar frequented by correction officers at the same time as O'Brien and several other coworkers. Another correction officer, Francis Gearraughty, left O'Brien's table and approached the plaintiff's table. The plaintiff testified that Gearraughty told the plaintiff and his friends that O'Brien wanted to know why they were "hanging out with a fag."[3] The plaintiff did not confront O'Brien, nor did he lodge any official complaint at that time.

On March 10, 1998, a package was sent to the home the plaintiff shared with his domestic partner. The package contained three children's toy blocks glued together to spell the word "FAG." The plaintiff reported the incident to the Boston police and to the investigation division of the sheriff's department (SID), the unit responsible for reviewing sexual harassment allegations in the department. On March 12, 1998, he filed a written report with Deputy Superintendent Lungelow. He informed the department and the police that he suspected O'Brien of spreading the rumors and sending the package.[4] The department investigator, when he heard from the plaintiff about his suspicions, told him that he did not think O'Brien would do something like that. His investigation also cleared O'Brien.[5]

Soon after the plaintiff filed his complaint, the plaintiff received a three-month work assignment as a guard in the female unit at South Bay, a position with which he was uncomfortable. He had not previously received such a lengthy assignment to this unit.

The department held a fact-finding hearing on April 17 on the plaintiff's complaint of harassment before an attorney for

---

[3] On the stand, Gearraughty denied making this statement.

[4] His complaint to the department also referenced vandalism to his car at work.

[5] The police also interviewed O'Brien, but were unable to identify who had made the telephone call or had sent the package.

the department, but took no further action on the plaintiff's complaint at that time. The plaintiff was concerned that the union president and chief shop steward attended the hearing. He had not requested their attendance and considered them friends of O'Brien. In their presence, the plaintiff did not identify the people who told him about the rumors because he was concerned they would be targeted for negative treatment.

The plaintiff further testified that on May 1, 1998, his commanding officer, Andy Rao, told the plaintiff that he "had a conversation with Errol [Depass, the shift commander], the other day and he's like, I could care less but just the way he said it, he's said that he couldn't believe that you were a fucking fag." The plaintiff did not report this conversation to anyone else in authority at the department because, as he testified, "anything I reported, nothing was being done, and I didn't do anything."

On May 6, 1998, a special sheriff from the department met with the plaintiff to determine how the department might accommodate his concerns about the rumors and the package sent to his home. The plaintiff requested a transfer out of the South Bay facility. His request was denied, however, because he lacked the necessary training for another position. On May 28, 1998, the plaintiff filed an official charge of discrimination with the Massachusetts Commission Against Discrimination (MCAD), alleging discrimination on the basis of sexual orientation in violation of G. L. c. 151B, § 4, which charge detailed his awareness of the rumors, his conversation with Rao, and his assignment to the female unit.

The plaintiff testified that on June 3, 1998, while he and a coworker were relieving Officer Deborah Powers[6] in the female unit, Powers remarked: "We had a survey in the unit today and out of all the fags, bisexuals and straights working in the unit, there's more fags working in here. Have a nice day working in the fag unit."[7] The plaintiff complained of this incident in writing to the attorney who had conducted the fact-finding hearing and to the deputy superintendent in charge of SID, as well as in

---

[6]Powers was the sister of the union president.

[7]Powers did not appear as a witness.

a letter from his attorneys to the sheriff.[8] Officials from the department interviewed Powers and exonerated her. Another coworker, Officer Martha Mojave, testified that Powers boasted to Mojave in July, "I was found not guilty. . . . That faggot, Michael Salvi, filed a complaint with SID and they found me not guilty." In front of a number of inmates, Powers called the plaintiff a "fucking faggot" and said that "he's been seen down in P-Town." Mojave's testimony was admitted over objection as evidence of the state of mind of "the people working at the Institution and the environment in which they're working," not for its truth. Mojave did not communicate these statements to the plaintiff for approximately eight months. She testified, however, that the statements made her concerned for the plaintiff's safety, because "inmates will prey on what they know."

On some unspecified dates in 1998, the plaintiff had problems at roll call. Coworkers would snicker and say "sissy" when the plaintiff's name was called. His coworkers also refused to sit with him at lunch in the prison cafeteria.

In July, 1998, the plaintiff received his next work assignment at South Bay: a transfer from the female unit to the solitary confinement unit. Both the plaintiff and Mojave testified that this was an undesirable assignment. There he would work alone with sixteen inmates. The plaintiff testified that he remained assigned to this unit for nine months.[9] A nine-month assignment was longer than other correction officers' assignments. Also, in early 1999, O'Brien was temporarily assigned to relieve the plaintiff at the end of his shift. The plaintiff believed that these assignments were intended to cause him further distress.

On October 13, 1998, en route to his locker, the plaintiff encountered Officer James Chamoun with two other coworkers. The plaintiff tapped one of the other officers on the shoulder and asked, "[W]hat's up?" The plaintiff testified that Chamoun responded, "Hey, don't touch [the plaintiff, he] might get a hard on." The plaintiff did not report this incident. The plaintiff also

---

[8]These writings were admitted over objection as evidence of notice to the department.

[9]We note that this was inconsistent with the stipulation of facts to which the parties agreed.

testified that there were "no more incidents of a sexual nature" after the Chamoun encounter. The rumors regarding him, however, appeared to persist.

Beginning in April, 1998, the plaintiff, who had put on thirty pounds and was anxious and stressed about work, sought help from a clinical psychologist. The psychologist observed in August that the "[e]ffects of harassment continue to taint all aspects of [Salvi's] life." In February, 1999, the psychologist noted, however, that the harassment at work had "abated, relationship problems continue." In April, 1999, a nurse at the Neponset Medical Center noted that the plaintiff had chest pains and high blood pressure and provided him with a note advising his employer that the plaintiff should not work alone for more than two hours. On several occasions, however, the plaintiff did work alone for more than two hours, both in the solitary confinement unit and in the prison "courtyard trap" (a small stall resembling a toll booth). In October, 1999, the plaintiff returned to the nurse, who reiterated in writing that the plaintiff was not to work alone for longer than two hours. Despite this second directive, the plaintiff continued to be assigned to work alone.

On October 17, 1999, while assigned to the visiting center at South Bay, the plaintiff reprimanded an inmate for kissing and fondling a visiting girlfriend in violation of prison policy. The plaintiff confiscated the inmate's prison identification badge and subsequently misplaced it. The plaintiff's supervising sergeant characterized the plaintiff's conduct as unprofessional and gave the plaintiff a verbal reprimand and a written warning for insubordination. This action further troubled the plaintiff, as he did not feel he had been insubordinate and had never had a problem with the sergeant before.

Following this incident, the plaintiff's treating psychologist noted a marked decline in the plaintiff's mood and diagnosed him with dysthemia, a form of prolonged depression. The plaintiff felt stressed by the rumors in the workplace, had difficulty sleeping, and his relationship with his domestic partner had become strained. His partner was seriously ill. On October 24, 1999, the plaintiff attempted to commit suicide. After the suicide attempt, the plaintiff's psychologist changed the diagnosis to major depression. The day after the suicide at-

tempt, the plaintiff left the department on medical leave and never returned to work. In April of 2000, his treating psychologist recommended that he not return to work. He finally resigned on April 9, 2000.

*Discussion.* a. *Hostile work environment.* The department claims the trial judge erred in denying the department's motion for a directed verdict and its motion for judgment notwithstanding the verdict following the jury trial. "In reviewing a ruling on a directed verdict or a judgment notwithstanding the verdict, the question before us is the same: that is, 'whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff." ' *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting from *Kelly* v. *Railway Exp. Agency, Inc.*, 315 Mass. 301, 302 (1943)." *Doe* v. *Senechal*, 66 Mass. App. Ct. 68, 76 (2006). "A hostile work environment is one that is 'pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization . . . .' " *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 532 (2001), quoting from *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination*, 400 Mass. 156, 162 (1987). To prove a hostile work environment claim, "the plaintiff [must] demonstrate that [he] worked in a sexually hostile environment that unreasonably interfered with [his] work performance. To sustain that burden, [the plaintiff must] establish that the conduct alleged was sufficiently severe and pervasive to interfere with a reasonable person's work performance." *Muzzy* v. *Cahillane Motors, Inc.*, 434 Mass. 409, 411 (2001).

The department contends that the evidence of a hostile work environment consists only of two statements made directly to the plaintiff by coworkers: Powers's June 3, 1998, statement about the plaintiff working in the "fag unit," and Chamoun's statement about not touching the plaintiff because he "might get a hard on." The department recognizes that these statements are admissible and constitute evidence of a hostile work environment. Harassment is defined by statute to include "verbal or physical conduct of a sexual nature when . . . such . . . conduct ha[s] the purpose or effect of unreasonably interfer-

ing with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." G. L. c. 151B, § 1(18), as amended by St. 1987, c. 473, § 2. These statements are just such verbal conduct. *Ibid.* See *Hunter* v. *Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1423 (7th Cir. 1986) (racist remarks were nonhearsay "direct evidence" of racial attitudes); Mueller & Kirkpatrick, Federal Evidence § 385 (2d ed. 1994) ("obvious examples [of verbal acts] include . . . claims of racial or sexual harassment [where words are the instrument of harassment]").[10]

Also admissible to establish a hostile environment are Gearraughty's and Rao's statements. The defendant claims that these statements may be admissible for other limited purposes, but not to establish a hostile work environment because they contain hearsay introduced to prove the truth of the matters asserted, i.e., what O'Brien and Depass, respectively, said. We disagree. The statements are additional examples of the type of verbal conduct referenced in the statute. Gearraughty's statement — that O'Brien wants to know why they were "hanging out with a fag" — is probative of a hostile environment separate and apart from whether it accurately reflects what O'Brien may or may not have said to Gearraughty. Gearraughty's statement was admissible not to prove what O'Brien said, which was hearsay, but to establish an offensive remark by Gearraughty designed to intimidate, offend, or humiliate the plaintiff because of his sexual orientation. G. L. c. 151B, § 1(18). See *Hunter* v. *Allis-Chalmers Corp., Engine Div., supra;* Mueller & Kirkpatrick, Federal Evidence, *supra.* What Gearraughty said, as opposed to what O'Brien said, can be established by the plaintiff, who heard it. See *Commonwealth* v. *Brum*, 438 Mass. 103, 117 (2002) ("Where, as here, an out-of-court statement is being introduced solely for the purpose of showing that it had been made, the witness on the stand who overheard that statement provides direct evidence that the statement was made . . . . Because the only fact at issue is whether the statement was

---

[10]Mojave's testimony regarding Powers's postexoneration statement — "that faggot Michael Salvi filed a complaint with SID and they found me not guilty" — is also admissible, as Mojave testified as to what Powers said to her and communicated that hostile statement, albeit eight months later, to the plaintiff.

made, not its underlying truth, there is no need to confront the original declarant").

Rao's communication of a homophobic slur with apparent indifference was also admissible. Again, it is admissible to prove what Rao said, not what DePass said, which is hearsay.[11] As Rao was a manager, his use of the slur and his knowledge of the rumors were relevant and probative of the work environment and management's reaction.

Unlike the department, we consider the block letter "FAG" package sent to the home the plaintiff shared with his domestic partner to be probative of a hostile work environment. It was reasonable for the jury to infer that the blocks were sent by someone from the plaintiff's workplace and were directed at the plaintiff given the timing of their arrival, which was after the rumors of the plaintiff's sexual orientation had surfaced at work and within a month of Gearraughty's offensive comment in the bar. The specific offensive word, "fag," was the same word that had been used in the earlier incidents. In determining whether the work environment is hostile, significant out-of-work harassment such as this may be considered as well. See Massachusetts Commission Against Discrimination Guidelines: Sexual Harassment in the Workplace § II.E (2002). See generally *Modern Continental/Obayashi* v. *Massachusetts Commn. Against Discrimination*, 445 Mass. 96, 106 (2005) (according substantial deference to MCAD's sexual harassment guidelines). See also *Beaupre* v. *Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 481 n.4 (2000) (referencing out-of-work conduct in sexual harassment case).

---

[11]The trial judge expressly stated that Gearraughty's and Rao's statements were not admitted to prove the truth of the matters they asserted. Although she further instructed the jury that the evidence was admissible to establish the plaintiff's state of mind, to which both parties agreed, this limitation was misplaced and somewhat misleading. As previously stated, the statements were admissible as verbal conduct that was direct evidence of a hostile environment. G. L. c. 151B, § 1(18). Furthermore, although the plaintiff's state of mind was relevant for certain issues such as, for example, determining emotional distress damages, it is not the plaintiff's subjective state of mind but the state of mind "of a reasonable person in the plaintiff's position" that is to be considered when determining whether the environment is hostile. *Muzzy* v. *Cahillane Motors, Inc.*, *supra* at 411-412, quoting from *Ramsdell* v. *Western Mass. Bus Lines, Inc.*, 415 Mass. 673, 677-678 n.3 (1993).

The shunning in the prison cafeteria and the snickering and name calling at roll call in 1998 provided further evidence of a hostile environment. The jury could have also considered the undesirable assignments to the "female unit" and the solitary confinement area to be harassment; likewise the forced contact with O'Brien. The department also ignored medical instructions that the plaintiff not work by himself for more than two hours, as he was assigned to long shifts alone in solitary confinement and the courtyard "trap" after relaying those instructions. When considered together, these actions could be interpreted by the jury to form a recognizable "pattern of mistreatment" of the plaintiff because of his sexual orientation. *Cuddyer* v. *Stop & Shop Supermarket Co., supra* at 533.

Finally, the jury were warranted in concluding that this was not a case where management took prompt and appropriate corrective action. See *College-Town, Div. of Interco, Inc.* v. *Massachusetts Commn. Against Discrimination,* 400 Mass. 156, 163 (1987); *Messina* v. *Araserve, Inc.,* 906 F. Supp. 34, 37-38 (D. Mass. 1995). The slurs and insults continued from at least February, 1998, until October, 1998, and the rumors persisted. O'Brien and Powers were exonerated despite the plaintiff's complaints. His commander, Rao, without expressing any concern, told him that the shift commander referred to him as a "fucking faggot." "An employer who passively tolerates the creation of a hostile working environment implicitly ratifies the perpetrator's misconduct . . . ." *Modern Continental/Obayashi* v. *Massachusetts Commn. Against Discrimination,* 445 Mass. at 105. The jury were even warranted in finding that the plaintiff's undesirable assignments, imposed by those he could have reasonably suspected of hostile sentiment and involving periodic contact with those he blamed for the harassment, reflected an active role by management in the harassment.[12]

b. *Constructive discharge.* 1. *Evidence supporting constructive discharge.* "A 'constructive discharge occurs when the employer's conduct effectively forces an employee to resign.' "

---

[12]We recognize that the jury did not find the assignments to be in retaliation for filing the complaints. That is, however, a different determination from whether the assignments were forms of harassment themselves imposed not in retaliation for the complaints, but because the plaintiff was homosexual.

*GTE Prod. Corp.* v. *Stewart*, 421 Mass. 22, 33-34 (1995), quoting from *Turner* v. *Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1244-1245 (1994). See *Rubin* v. *Household Commercial Financial Servs., Inc.*, 51 Mass. App. Ct. 432, 439 (2001). This requires "an objective assessment" of the conditions at work, and a determination that "they were so difficult as to be intolerable." *GTE Prods. Corp.* v. *Stewart, supra* at 34.

The defendant urges that its motions for a directed verdict or for judgment notwithstanding the verdict should have been allowed on this claim. We conclude that there was sufficient evidence to establish a constructive discharge. Although the slurs and statements made directly to the plaintiff had discontinued after the Chamoun incident, the cumulative impact of the persistent rumors regarding the plaintiff's sexual orientation,[13] the lingering effects of the slurs and the shunning and the snickering, the undesirable assignments, the plaintiff's unsuccessful pursuit of administrative remedies, the exoneration of O'Brien and Powers, the special concerns of being isolated in an environment where the support of one's coworkers is critical to one's own safety, and the deterioration of the plaintiff's mental health attributable, at least in part, to the plaintiff's problems at work, provided the jury with the necessary evidence of intolerable working conditions. Significantly, the plaintiff's treating psychologist advised the plaintiff not to return to work because the environment there was unduly stressful.

2. *Jury instructions and special question on constructive discharge.* In addition to challenging the sufficiency of the evidence regarding constructive discharge, the defendant makes belated objections to the instructions and the special verdict form. The defendant concedes that the judge's instructions to the jury set out the proper legal standard for constructive discharge, but claims, nonetheless, that the judge failed to inform the jury how the constructive discharge claim related to the calculation of damages. The defendant also objects to the special verdict questions it helped prepare, because they did not

---

[13]We note that the plaintiff strongly desired to keep his sexual orientation a private matter at work.

include a specific question regarding constructive discharge.[14] After the trial judge had concluded the reading of the final instructions, counsel for the defendant stated, "[T]he defendant is content [with the instructions]." As objections were not presented to the trial judge, the arguments are waived. Mass.R. Civ.P. 51(b), 365 Mass. 816 (1974). Compare *Muzzy* v. *Cahillane Motors, Inc.*, 434 Mass. at 417.

c. *Prejudgment interest.* 1. *Prejudgment interest on back pay and emotional distress awards.* On cross appeal it is conceded that the trial judge's decision to vacate the award of prejudgment interest was based on case law that has since been overruled. It is now settled law that sovereign immunity is no bar to the liability of a public sector employer for prejudgment interest on damages in a G. L. c. 151B discrimination case. "[W]e are satisfied that the Legislature has expressed its intention . . . that sovereign immunity with respect to the imposition of interest on a G. L. c. 151B damage award has been waived." *DeRoche* v. *Massachusetts Commn. Against Discrimination*, 447 Mass. 1, 14 (2006). We therefore reinstate the award of prejudgment interest to the plaintiff on the back pay and emotional distress awards. Since these damages are compensatory in nature, they do not fall within the prohibition on prejudgment interest on damages which serve a purpose other than to make the plaintiff whole. See *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.*, 25 Mass. App. Ct. 302, 320-321 (1988); *Ventresco* v. *Liberty Mut. Ins. Co.*, 55 Mass. App. Ct. 201, 211 (2002) (affirming award of prejudgment interest on both back pay and emotional distress damages).

2. *Prejudgment interest inapplicable to front pay and punitive damage awards.* The department contends that it is improper, however, to award prejudgment interest on the plaintiff's lost future earnings and punitive damage awards. We agree. The

---

[14]Rule 49(a) of the Massachusetts Rules of Civil Procedure, 365 Mass. 812 (1974), provides, in pertinent part: "If in [giving a special verdict], the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. As to an issue omitted without such demand, the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict."

primary purpose of an award of interest under G. L. c. 231, § 6B, is "to compensate a damaged party for the loss of use or the unlawful detention of money." *Conway* v. *Electro Switch Corp.*, 402 Mass. 385, 390 (1988). "We, therefore, see no justification for adding interest to damages which, by definition, are for losses to be incurred in the future. . . . General Laws c. 231, § 6B, cannot reasonably be said to apply to an award of damages based upon lost earnings and benefits occurring after the date of judgment. [We conclude that] prejudgment interest may not be added to an award of damages for lost future earnings and benefits." *Id.* at 390, 391.

Prejudgment interest is equally inappropriate on an award of punitive damages. "Prejudgment interest, as is well understood, compensates the prevailing party for loss of the use of money that party, as determined by the judgment, should have had in the first place and not been obliged to chase. In that way compensatory damages are truly compensatory and, in monetary terms, the winner is no less well off for the chase. . . . No similar purpose would be served by imposing interest on punitive damages which, as we have seen, have a purpose beyond restoring to a plaintiff what should have been his." *Makino, U.S.A., Inc.* v. *Metlife Capital Credit Corp.*, *supra* at 320-321. See *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. 704, 716 (1990) ("We are satisfied that the rule in *Makino* is the correct one"). Accordingly, we decline to reinstate the award of prejudgment interest on the plaintiff's front pay and punitive damages awards.

3. *Statutory interest rate.* The department, relying on *Secretary of Admn. & Fin.* v. *Labor Relations Commn.*, 434 Mass. 340, 346-347 (2001), argues that the appropriate rate to calculate prejudgment interest on these damages is the floating market rate set forth in G. L. c. 231, § 6I, rather than the flat rate of twelve percent per annum prescribed by G. L. c. 231, § 6B. *Secretary of Admn. & Fin.* v. *Labor Relations Commn.*, however, involved the awarding of prejudgment interest pursuant to G. L. c. 150E, not G. L. c. 151B. In *DeRoche* v. *Massachusetts Commn. Against Discrimination*, 447 Mass. at 15 n.16, the Supreme Judicial Court expressly rejected the applicability of *Secretary of Admn. & Fin.* v. *Labor Relations Commn.* to G. L.

c. 151B interest calculations, or at least those undertaken by the MCAD itself. In so doing, the court also reconfirmed "the [MCAD]'s assessment of interest on back pay awards in conformity with the statutory rate of twelve per cent provided for in G. L. c. 231, § 6B." *Id.* at 14-15.

Finally, this court has recently approved prejudgment interest at the rate of twelve percent in G. L. c. 151B actions brought in Superior Court. See *Smith* v. *Bell Atl.*, 63 Mass. App. Ct. at 726; *Scott* v. *Boston Hous. Authy.*, 64 Mass. App. Ct. 693, 694-697 (2005).

4. *Effective date for accrual of interest.* The plaintiff argues on cross appeal that G. L. c. 231, § 6B, which provides that prejudgment interest accrues "from the date of the commencement of the action," requires us to calculate his interest award from May 24, 1998, the date of his initial complaint to the MCAD. We disagree. In cases pursuant to G. L. c. 151B, § 9, we have held that "prejudgment interest on a damage award is calculated from the date when the action is commenced in the Superior Court, not the filing of a complaint with the MCAD." *Scott* v. *Boston Hous. Authy.*, 64 Mass. App. Ct. at 696. See *Smith* v. *Bell Atl.*, 63 Mass. App. Ct. at 726, citing with approval *Blockel* v. *J.C. Penney Co.*, 337 F.3d 17, 29-31 (1st Cir. 2003) (adopting position "that 'commencement of the action' logically refers to initiation of the lawsuit in court and not to the filing of the precourt agency action"). We conclude that the effective date for the accrual of interest on the plaintiff's damages for back pay and for emotional distress is July 27, 2000, the date that the plaintiff initiated his suit in the Superior Court.

*Conclusion.* The portion of the amended judgment providing that there shall be no prejudgment interest on the award is modified to provide prejudgment interest on the awards for (1) back pay and (2) emotional distress, which prejudgment interest shall be computed at the rate of twelve percent per annum from July 27, 2000. As so modified, the amended judgment is affirmed.

The plaintiff has requested appellate attorney's fees. General Laws c. 151B, § 9, provides for an award of attorney's fees to a prevailing plaintiff; this includes appellate attorney's fees. See *DeRoche* v. *Massachusetts Commn. Against Discrimination*, 447

Mass. at 18; *Lowell* v. *Massachusetts Commn. Against Discrimination*, 65 Mass. App. Ct. 356, 357 (2006). In accordance with the procedure set in *Fabre* v. *Walton*, 441 Mass. 9 (2004), the plaintiff may file his application for appellate attorney's fees and costs within fourteen days of the date of the rescript, and the defendant shall have fourteen days within which to respond.

*So ordered.*