NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12974

TOWN OF BROOKLINE  vs.  GERALD ALSTON & another.[1]


Suffolk.     January 8, 2021. - April 27, 2021.

Present:  Budd, C.J., Gaziano, Lowy, Cypher, Kafker, Wendlandt,
& Georges, JJ.


Civil Service, Decision of Civil Service Commission, Fire
     fighters, Reinstatement of personnel.  Fire Fighter.
     Municipal Corporations, Fire department.  Administrative
     Law, Substantial evidence.  Employment, Discrimination,
     Termination.  Public Employment, Termination, Reinstatement
     of personnel.  Judgment, Preclusive effect.  Anti-
     Discrimination Law, Race, Employment.



     Civil action commenced in the Superior Court Department on
March 18, 2019.

     The case was heard by Douglas H. Wilkins, J., on motions
for judgment on the pleadings.

     The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


     Joseph A. Padolsky for the plaintiff.
     Brooks A. Ames for Gerald Alston.
     Robert L. Quinan, Jr., Assistant Attorney General, for
Civil Service Commission.

---

     [1] Civil Service Commission.

Joseph L. Sulman, for Massachusetts Employment Lawyers Association & another, amici curiae, submitted a brief.

Jin-Ho King & Ilyas J. Rona, for Brookline for Racial Justice and Equity & others, amici curiae, submitted a brief.

KAFKER, J.  The issue presented is whether the Civil Service Commission (commission) can consider evidence related to a racially hostile or retaliatory work environment when assessing whether a municipality had just cause to terminate a tenured civil service employee.  The underlying dispute in this case began with a racist comment, apparently on a misplaced telephone call.  As Lieutenant Paul Pender was in a car driven by his son, he was cut off by a stranger.  Pender referred to the person as a "fucking n----r."  Unbeknownst to him, Pender had not properly hung up from a previous call, and he left a record of what he said on the voicemail of fellow firefighter Gerald Alston.  Alston is African-American; Pender, his supervisor at the time, is Caucasian.  A tumultuous six years of litigation and acrimony ensued, culminating in 2016 with Pender receiving his third promotion since leaving the voicemail and Alston being fired by the town of Brookline (town).  When Alston challenged his termination before the commission, the commission first summarily concluded that the town had just cause to terminate Alston due to his extended absence from duty and his failure to cooperate with the town's return to work requirements.  Alston successfully challenged that ruling in the

Superior Court, and the matter was remanded to the commission for an evidentiary hearing.  After that hearing on remand, the commission concluded that there was not just cause for the discharge, as the decision to terminate Alston was "arbitrary, capricious, and in violation of [his] rights under the civil service law to be treated fairly 'without regard to . . . [his] race.'"  The commission ordered his reinstatement, and that decision was affirmed by the same Superior Court judge.  The town appealed, and we transferred the matter to this court on our own motion.

We first conclude that the commission can consider, in the context of its analysis whether an employee was fired without just cause in violation of basic merit principles, evidence of discriminatory or retaliatory conduct that is more typically addressed in the context of a claim under G. L. c. 151B.  The relevant statutes ensure that civil service employees are not terminated without just cause and that their termination be consistent with basic merit principles.  A civil service employee whose unfitness is determined to be caused by racist remarks and retaliation in the workplace and the employer's arbitrary and capricious response to such remarks and retaliation may not be terminated by the employer responsible for causing the unfitness.  Applying this standard, we conclude that the commission's determination that the town lacked just

cause to discharge Alston is supported by substantial evidence. Finally, as described more fully infra, we reject each of the town's arguments as to why the commission exceeded its authority and lacked substantial evidence for its decision.[2]

1. Commission's findings. We present the relevant facts as found by the commission. As this case involves events that occurred over the course of six years, and because its disposition depends on the unusual, if not unique, facts found here, we provide a detailed factual and procedural background.

a. Voicemail incident. Alston became a firefighter with the town in 2002. He served on a full-time basis for eleven years. He was considered a "very good firefighter." In 2010, he was assigned to Group 2, Station 5. Pender, then a lieutenant, was one of Alston's supervisors in Group 2. Pender joined the town's fire department (department) in 1984. Prior to May 2010, Pender and Alston had a good relationship. Alston described Pender as someone he "attached to when [Alston] got on the job because [Pender] knew, as far as [Alston] could tell, everything about the station, everything about firefighting . .

---

[2] We acknowledge the amicus brief submitted by Brookline for Racial Justice and Equity, Raul Fernandez, and Brookline Budget Justice, as well as the amicus brief submitted by the Massachusetts Employment Lawyers Association and Lawyers for Civil Rights.

. . [Alston] would ask certain questions and [Pender] always had the answer."

Early in 2010, Alston suffered an injury while on duty that kept him out of work. On May 30, 2010, Pender called Alston to check on his well-being, but the call went to Alston's voicemail. Pender thought that he had ended the call but in fact had not. As a result, Pender left the voicemail on Alston's telephone in which he said "fucking n----r."[3] Alston's wife listened to the voicemail first and then told Alston to listen to it. Alston was shocked and hurt by the slur. Unsure whether the voicemail included the slur, Pender called Alston numerous times that same day and in the ensuing days; Alston never returned his calls. Pender testified that he also told other firefighters what happened and "sort of expressed relief [to them] that . . . [Alston] was [his] buddy and [he was] sure nothing was going to happen."

Alston sought advice from several senior firefighters on what he should do about the incident. He also spoke with the chief of operations, Michael O'Reilly, shortly after May 30 and played the voicemail for him. O'Reilly did not report the

---

[3] At the time he used the racial slur, Pender was in a car with his son driving. The commission credited Pender's testimony that Pender used the slur to refer to another driver, not Alston. Pender has described the driver at whom he directed the slur on various occasions as "a young black kid," a "black or Hispanic" male, and "some young gangbanger."

incident to the fire chief or town officials. O'Reilly and Alston agreed that Alston would reach out to Pender directly. Pender and Alston spoke by telephone on July 8, and Pender told Alston that the slur was not intended for him but was directed at "some young gangbanger" who had cut him off in traffic. This further upset Alston, who ended the call. Pender called Alston again two days later and repeated his explanation of the context in which he made the slur. He also told Alston that reporting the incident to O'Reilly was the most stupid thing Alston could have done and asked Alston, "Do you want me to lose my job?"

On July 28, Alston sent a formal complaint to the then fire chief, Peter Skerry. Skerry immediately notified the town's director of human resources, Sandra DeBow. Two days later, on July 30, Alston, his wife, Skerry, O'Reilly, and town counsel met to address the complaint. Alston played the voicemail at the meeting. After hearing the message, Skerry determined that Pender's use of the slur was a fireable offense and told Alston that he would fight for Pender's termination. Alston responded that he did not want Pender terminated. Skerry also told Alston that Pender would be ineligible for a promotion and assured Alston that the department took his complaint seriously. That day, Pender was transferred to another station.

DeBow began an investigation into the incident.[4]  As part of her investigation, she interviewed Pender on August 2.  During that interview, Pender admitted using the slur but maintained that it was not directed at Alston.  On August 16, DeBow issued her investigative report, which concluded that Pender's use, during a work-related call, of "profanity and a well-recognized, racially-inflammatory term rises to the level of conduct unbecoming to a firefighter as it would tend to lower the service in the estimation of the [p]ublic, and further that such conduct is also prejudicial to good order."  DeBow recommended progressive discipline, Pender's permanent transfer, mediation between Alston and Pender, development of an antidiscrimination policy, and antidiscrimination training, including training on supervisors having a duty to report incidents.

On August 17, the day after DeBow issued her report, the town's board of selectmen (board) held a closed-door disciplinary hearing for Pender.  Alston was not called as a witness and did not appear before the board.  Skerry recommended that Pender be suspended for four tours (the equivalent of eighty-four hours of lost pay).  The board rejected Skerry's recommendation and chose to suspend Pender for two tours with

---

[4] Alston wanted outside counsel, rather than Sandra DeBow, to conduct the investigation, and he and DeBow had a heated argument about this subject at some point.

another two tours held in abeyance pending no further misconduct.[5]  Pender served his two-tour suspension between August 30 and September 6.[6]

On September 10, four days after he completed his suspension, Pender was promoted to temporary fire captain.[7]  Alston learned of the promotion on September 15 and immediately called DeBow to voice his objection, particularly given Skerry's representations at the July 30 meeting that Pender would not be promoted.  Alston also expressed his agitation with Pender's promotion when speaking with Skerry on October 12.

b.  Subsequent incidents in 2010.  Before Alston returned to work, Skerry met with the officers to address rumors of backlash against Alston after Pender's transfer from the station.  Skerry told the officers that the town had zero

---

[5] The board also ordered Pender's permanent transfer from that station and required mediation with Alston, anger management training, and diversity training.

[6] Pender's two-tour suspension equated to a loss of forty-two hours of pay.  In 2013, however, Pender and the town entered a settlement agreement in which the town gave Pender forty-two hours of vacation time.  Pender alleged that this time was the result of long-standing issues over vacation time with the town and not related to his 2010 suspension, but neither Pender nor the town was able to provide any documentation to support that contention.

[7] Pender was promoted as part of a series of promotions to fill vacancies after a deputy chief position opened.  His name was at the top of the civil service list for the temporary captain position.

tolerance for discrimination or retaliation and that a firefighter had exercised his right to file a complaint and should be treated cordially when he came back to work.  Alston returned to work on September 21, 2010.

Two days after Alston returned, Firefighter Joseph Canney posted a message on the union's blog.  The commission found that the post was referring to Alston.  The post stated:

"FACELESS COWARD

"by Joe Canney

"To the faceless coward who for no good reason, except of course his own self interest leaked to the media about one of our BROTHER"s [sic] alleged acts of misconduct on what should have been the proudest day of their professional lives is _____.  I honestly can't even find an appropriate word for it.  I have been around this job a long time and seen and heard a lot, but this even exceeds my wildest expectations of someones [sic] having a personal agenda to destroy another.  This union went through this type of personal, meritless attacks before and it almost destroyed us, don't let this ever happen again, for all our sakes!"

Alston reported the post to Skerry, and Skerry told him that he would ask the union to remove the post.  The town did not investigate the post or Canney and took no further action related to the post.

In November 2010, Alston was transported by ambulance to a hospital after becoming highly agitated by the driving assignments made by his lieutenant at work.  Alston was upset that he was assigned to a particular vehicle and a less senior

probationary firefighter had been assigned to the other vehicle. The probationary firefighter was Pender's nephew. When Alston expressed his displeasure with the assignments, another firefighter responded that the assignments had nothing to do with Pender. This comment enraged and agitated Alston, and he agreed to be taken to a hospital. While in the hospital, Alston tested positive for cocaine and admitted that he had used it recently for the first time in twenty years. Alston also disclosed that he had started smoking marijuana in July to deal with his anger and anxiety and that he had lost forty pounds over the preceding few months due to his loss of appetite and stress from work.

Beginning in late 2010, Alston was diagnosed on numerous occasions with "adjustment disorder."[8] Notes from a social worker interview on October 14, 2010, reveal that Alston reported experiencing racism at work and explained that his anger was exacerbated by the way in which his supervisors and colleagues responded to the incident. He raised similar concerns with treatment providers in November and December 2010 as well and continued to do so in the ensuing months.

---

[8] One of the psychiatrists who examined Alston described adjustment disorder as "a DSM-5 diagnosis in which a person has a psychological response to specific stressors, however the response is more severe or lasts longer than one would normally expect."

c.  Other allegations by Alston.  Alston filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) on May 24, 2012.  He alleged that the town discriminated against him by promoting Pender after he used the racist slur and that the town handled the incident differently because of Alston's race.  In an amended complaint filed on November 19, Alston alleged that he had been "shunned, isolated and mocked by his fellow firefighters at the direction and instruction of his superiors for three years with significantly worsening conditions" and that he had "made repeated complaints to his chiefs and human resources on a monthly, if not weekly basis" through 2011 and early 2012.[9]  The town attempted to investigate the claims in Alston's amended MCAD complaint, but Alston refused to participate in the investigation.  The town could not find any corroboration for his allegations.

On at least two occasions, Pender and Alston spoke in person about the voicemail.[10]  After each conversation, Pender took transcript-like notes to summarize the conversations, both of which he gave to DeBow on November 19, 2013.  During the first conversation, which took place in February 2011, Pender

---

[9] Alston ultimately withdrew his MCAD complaint and chose to pursue a lawsuit in court.

[10] Alston approached Pender and initiated the conversation on each occasion.

told Alston, "I don't know how we can be good Gerald, you destroyed my life and ruined my career. But I'm glad you're good. . . . I tried to tell you when we talked on the phone that if you went to the Chief this would create a huge shit storm." Six days later, Alston reached out to his psychiatrist, Dr. Michael Kahn, to say that he was "very depressed, anxious, sleeping badly, crying, [and] not focusing."

On the second occasion, in late October 2013, Pender told Alston that his name and his family's name were being dragged through the mud and that Alston's lawsuit against the town "was a bunch of lies" with "very little truth in it." Pender also said that his use of the slur was the result of road rage, which "can be a side effect of [posttraumatic stress disorder], which [he] had been treated for after a bad fire the previous year." Pender also questioned Alston about statements in the lawsuit indicating that Alston said that Pender should not have been promoted. On that same day, Alston reached out to his psychiatrist and reported that he felt like "beating someone up" and was "very focused on . . . wanting to get retribution and satisfaction for his having been called a racial slur allegedly two to three years ago."

On May 1, 2013, Chief Paul Ford, the fire chief who succeeded Skerry, had recommended Pender for permanent promotion to captain. With regard to how the voicemail incident affected

his considerations, Ford later testified in a deposition, "I mean, we all know that he said something he should [not] have. . . . I looked at that he was disciplined, so, sort of paid his price." The board permanently promoted Pender to captain on May 7. In his new role, Pender served as captain of training, which he described as the second in command of training new firefighters. When training new recruits, Pender would tell them "[his] side of the story" regarding the voicemail incident and that what they heard about the incident from the media "is a bunch of lies."

On June 17, 2013, Alston commenced a civil action against the town in the Superior Court in Norfolk County (Norfolk litigation). The action was based on the same allegations as in his amended MCAD complaint and alleged discrimination under G. L. c. 151B. During discovery, Alston provided the following details on his work environment in response to interrogatories:

> "I was sent to Station 4 in December of 2011 or January of 2012. When I arrived I entered the kitchen and said 'good morning guys.' One of several firefighters replied. I approached one firefighter to shake his hand at which point he stood up and walked away. I worked twenty-four hours. Prior to finishing my shift I went to the dining area to find out when dinner would be held. I found all of the firefighters on duty eating together as is the norm. I asked why I hadn't been told that dinner was happening and they replied 'what are you talking about.'

> "The next morning I woke up and went to breakfast where several firefighters were sitting with Lt. Pender. Again, I stated 'good morning guys' and once again no one responded. When I began to prepare my breakfast they left

the room.  This was the standard response each and every time I worked in a station other than my usual Station Five for several years, until recently when this case was publicized in a local newspaper article.

" . . .

"Prior to the incident with Lt. Pender I attended many family social events for my fellow firefighters including weddings, parties, cookouts, Baptisms, graduations etc., etc.  After the Lt. Pender incident I was never invited to those events.  Before the Lt. Pender incident I was proud and privileged to serve as the singer of the national anthem at graduations and retirement services.  After the Lt. Pender incident, to this day, I have never been invited to participate in those ceremonies in any way."

This case was dismissed in July 2014 because of Alston's noncompliance with discovery requests.[11]

d.  "Leave" incident.  On December 18, 2013, Alston told a lieutenant that he planned to ask for a transfer to another station.  The next day, as Alston was preparing to end his shift, he found the word "Leave" written on the door to his seat on the fire engine under his jacket.  Alston photographed the message and told several nearby firefighters about it.  Alston told these firefighters that he was not going to put up with this anymore and that he had kept quiet for a long time, and said something to the effect of "shooting up the place."  When he returned for his next shift several days later, Alston addressed the group of firefighters at his station.  As he was

---

[11] Alston's attempts to obtain relief from the judgment were denied in July 2015.

speaking, he became very agitated and said, "[P]eople go postal over matters like this."  The two lieutenants at the station concluded that he was likely just "blowing off steam" but reported the statements to their superior.  Ford spoke directly with Alston at the station, and Alston became extremely agitated as they spoke.  Alston eventually told the chief and deputy chief, "Look, he's my friend, and you're my friend, and even you could get caught in a cross-fire."  Ford told Alston to go home that day.  When they spoke the next day, Alston agreed that he was not in a good place with regard to his mental health and agreed to be evaluated by the town's psychiatrist, Dr. Andrew Brown.  On December 27, 2013 -- five days after Alston had made the "postal" and "shooting" comments -- the chief told Alston he was not allowed on town property until Brown completed his evaluation.[12]  The town's police department circulated a flyer to all of its officers on around December 27 with Alston's photographs and description and information reflecting Alston's comments about "going postal."

　　e.  Evaluations and failed attempts to return to work.
Brown concluded his first fitness for duty evaluation of Alston

---

[12] Brown evaluated Alston on January 6, 2014.  Brown told the chief and DeBow soon thereafter that Alston did not pose any threat to himself or others.  At this point, the stay away order against Alston was withdrawn.  Alston, however, never returned to work after December 22, 2013.

on January 21, 2014, about one month after Alston's comments at the station.  Brown told Ford and DeBow that Alston did not pose any threat to himself or others.  Brown determined that Alston's ability to regulate his emotions was impaired and that this compromised his capacity to perform consistently the duties of a firefighter.  Brown opined that Alston needed psychiatric treatment to address this impairment.  Over the next few months, Brown and Kahn continued to evaluate Alston and communicate with each other about Alston's condition.

On March 19, 2014, Alston submitted a written request for a transfer to a smaller station.  Around the same time, the town received Alston's medical records from his November 2010 hospital visit through discovery in Alston's lawsuit in the Norfolk litigation.  These records revealed Alston's cocaine and marijuana use.

On May 14, 2014, DeBow released two investigatory reports related to the December 2013 incident.  One report considered whether the "Leave" writing violated the town's antidiscrimination policy.  DeBow concluded that it could not be determined who had written "Leave" or why.  The report also suggested, without any factual basis, that

> "the possibility cannot be discounted that the word 'Leave' was written by a member of the . . . fraternity to which the truck had made a run the previous evening or some other neighbor or member of the public passing by who saw a ready canvas of salt and sand and took the opportunity to write

the word 'leave.'  Again, there is no evidence to establish that this scenario occurred nor is there any evidence that it did not occur."

In the other report, DeBow concluded that Alston violated the workplace safety policy with his "shooting" and "going postal" comments.  DeBow found that these comments "caused [Alston's] co-workers to be reasonably afraid of violent acts in the workplace."  The town imposed a two-tour suspension and a return to work plan on Alston.  The chief wrote to Alston that he would need to meet several conditions to return to work.[13] The chief also told Alston that his transfer request "will be addressed upon your return to duty."

Alston met with Kahn on October 7, 2014.  Kahn conveyed to the town that Alston was "angry at everyone," "in desperate financial straits," "living out of his car," upset that the Norfolk litigation had been dismissed, and concerned that Brown was lying to him.  The town informed Alston that he had used up his available leave on October 23.  On November 24, Alston and his attorney, accompanied by some of Alston's supporters, showed

---

[13] Those conditions were (1) regular and ongoing psychiatric treatment; (2) execution of a release authorizing the town to discuss his treatment and progress with his provider; (3) completion of an anger management course; (4) satisfactory reevaluation of his fitness to return to duty by a town psychiatrist; and (5) random urine drug testing for twenty-four months upon his return to work.  Alston satisfied each of the first three conditions in the following months.  Around this time, his complaint in the Norfolk litigation was dismissed.

up for a meeting with the fire chief and DeBow.  The meeting did not go forward, however, as Alston and his attorney insisted that the supporters be allowed to be present.  On the next day, November 25, DeBow sent Alston a letter that faulted Alston for not attending meetings at which his return to work (with or without accommodations) would be discussed, gave Alston until December 4 to identify reasonable accommodations for his return, and notified Alston that he had to attend a follow-up evaluation on December 5.  Later, on December 19, a member of the board wrote a letter to Alston that stated:

> "The Board of Selectmen acknowledged more than four years ago, and this Board acknowledges today, that unspeakable words were left on your voicemail that should never have been said.  We acknowledge the deep hurt that those words caused you, and we acknowledge the wrongdoing of your supervisor.  We are also informed that the supervisor who uttered those words to you and was formally disciplined for the incident offered his apology to you, and has since repeatedly expressed remorse and regret for his conduct."

f.  Evaluation by Dr. Price.  Dr. Marilyn Price conducted the follow-up evaluation of Alston on February 12, 2015.[14]  Price met with Alston for about three hours and reviewed all of his medical records.  She described her role as "to say can [Alston] go back and work and under what circumstances can he go back to work."

---

[14] The town replaced Brown with Price because Alston no longer trusted Brown.  Alston's concern was partially based on the fact that Brown did not disclose that he was a former student of Kahn, Alston's personal psychiatrist.

As several other providers had previously done, Price diagnosed Alston with adjustment disorder. She identified four stressors that affected Alston: the voicemail from Pender; Pender's promotion to temporary captain in September 2010; the reference to the Pender incident by a superior in November 2010; and discovering the word "Leave" under his jacket in December 2013. Price found that "[h]earing a racial slur from a Lieutenant he trusted was especially troubling to Firefighter Alston because it called into question how he was really perceived by his fellow firefighters and raised concern about whether others would have his back in dangerous situations." She explained that the effect of these stressors was "perpetuated" because legal issues and negotiations "keep the stressor alive, essentially." She further explained, "Unless the work environment can be modified so that Firefighter Alston's level of stress is decreased, it is very unlikely that he would be able to work effectively and have the level of trust of his fellow firefighters that is required." Price also gave great weight to the fact that Alston said that he wanted to return to work.

Price concluded that Alston could return to work if three conditions were met. First, Alston would have to receive monthly treatment from a psychiatrist and weekly treatment with a therapist. Second, there would have to be reasonable

workplace accommodations that reduced the level of stress for Alston.  Third, Alston would have to undergo random drug screening for two years after he returned to work.  The town sent Price's report to Alston on March 25, 2015.

After Price completed her evaluation and issued her report, the town attempted to schedule meetings and communicate with Alston on numerous occasions regarding his return to work. Beginning in August 2015, the town reached out to Alston or his attorney a number of times with little success.  For example, after the town identified March 7, 2016, as a return to work date, it scheduled Alston for a drug test on February 10, but Alston failed to appear.  Then, after demanding to Ford that he be allowed to meet with the full board in March 2016, Alston and his attorney did not respond to subsequent calls and letters from Ford and his successor.  Alston and his attorney continued to ignore the department's attempts to contact Alston and schedule meetings through August 2016.

Alston commenced a lawsuit in Federal court in December 2015 against the town, the union, and various town officials, alleging civil rights violations under Federal law.  A Federal judge concluded that Alston could not bring any claims that he either brought or could have brought in the Norfolk litigation. Alston v. Brookline, 308 F. Supp. 3d 509, 516 (D. Mass. 2018). The judge granted summary judgment in favor of the town on

Alston's remaining claims, concluding that there was no genuine dispute of material fact that the town did not discriminate against Alston. Alston vs. Brookline, U.S. Dist. Ct., No. 15-13987-GAO (D. Mass. Apr. 2, 2020). Rather, the judge concluded that the town fired Alston because "he repeatedly declined to attend meetings he was invited to or present evidence of his own about his ability to return to work." Id. Alston's appeal from the summary judgment decision currently is pending.

g. Pender's third promotion and Alston's termination. On June 16, 2016, Pender was recommended for another promotion to temporary deputy fire chief. Pender provided the board with a written statement as it considered the recommendation on June 21. In that statement, Pender told the board that he had "apologized countless times for [his] action [on the day he left the voicemail]" and stated, "I don't know what happened back then between Mr. Alston and the Town, but apparently he felt slighted somehow. His course of action, which gets the most attention, is to drag me into it all over again." Several firefighters spoke on Pender's behalf, decrying the "narrative fabricated" against Pender and the town. One of the deputy chiefs said, "[W]e should have all moved on" and lamented the "smear campaign" led by "a few people with a separate agenda."

At a subsequent hearing on July 12, several members of the board endorsed Pender's promotion. One member emphasized,

"Brookline needs to move on and cease debating past rights and wrongs.  A better future is not possible if we remain trapped in conversations about perceived past misdeeds or mistakes."

Another stated that

> "hav[ing] 'zero tolerance' for any use of the N word, or any of the other words that have vile and hurtful histories and usages, would not be good policy where that use is a one-time and isolated act.  Such an act warrants discipline, but the use of racist slur six years ago, without more, cannot be justification to permanently preclude someone form [sic] the benefits of employment he would otherwise be entitled to receive. . . .  [Pender,] after having made this grievous mistake, did come around and begin to repair the damage he caused . . . ."

Pender's promotion became effective a few days later, on July 18.

On July 21, 2016, DeBow informed Alston that the town had scheduled a return to work evaluation for him on August 2.  When Alston failed to appear for the evaluation, the town notified Alston of his contemplated discharge on August 17.  An outside hearing officer held a hearing on August 30 and issued a report recommending that the town terminate Alston.  The town notified Alston of the hearing officer's findings on September 30 and told him that his termination would be considered at the October 5 board meeting.  The board voted to terminate Alston at that meeting.[15]

---

[15] Alston had been absent from work on various forms of leave since December 22, 2013.

2.  Procedural history.  Alston appealed from his termination to the commission.  In 2017, the commission upheld his termination and dismissed Alston's appeal in a summary decision.  The commission concluded that the town "had reasonable justification to conclude that [Alston] was not then capable of performing the duties of his position as a . . . Firefighter and that there was no reasonable basis to expect his return to duty at any time in the foreseeable future, with or without accommodations."  Alston appealed from this order to the Superior Court under G. L. c. 30A, § 14.  The judge vacated the commission's order and remanded it to the commission for an evidentiary hearing.  The judge, interpreting the civil service law, held that "an employer lacks 'just cause' if a termination would not have occurred but for the employer's racially hostile environment, maintained in violation of basic merit principles."  The judge also reasoned that "an employer has no right to demand proof that an otherwise fit employee can perform job duties in a racially hostile environment."  The judge concluded that the commission could not decide the issues in a summary decision and remanded the case to the commission for the evidentiary hearing.

On remand, the commission conducted a ten-day evidentiary hearing.  It heard testimony from fourteen witnesses and received 280 exhibits.  As discussed more fully infra, the commission concluded that the town lacked just cause to

terminate Alston and ordered his reinstatement.  The town then appealed from the commission's order to the Superior Court.  The Superior Court judge granted Alston's motion for judgment on the pleadings.  The town appealed.

3.  Discussion.  The town raises numerous issues on appeal. At the heart of the town's appeal, however, are two core arguments.  The town first argues that the commission exceeded its authority by considering claims of discrimination that must instead be addressed under G. L. c. 151B, and by ignoring the preclusive effect of prior litigation.  The town then argues that the commission's determination that the town lacked just cause to terminate Alston is not supported by substantial evidence.  Rather, according to the town, the evidence demonstrates that the town had just cause to terminate Alston because he could not perform the duties of a town firefighter and failed to comply with the town's return to work requirements.  We address each argument in turn infra, starting with the two relevant statutes and explaining the overlapping protections they provide, how the statutes interact with each other, and the remedies each furnishes.

a.  Relevant statutory language.  Under the civil service law, G. L. c. 31, an appointing authority cannot discharge or remove an employee without "just cause."  G. L. c. 31, § 41 ("Except for just cause . . . , a tenured employee shall not be

discharged . . . [or] removed . . ."). Although the civil service law does not define what constitutes "just cause," we have held that it exists where the employee has committed "substantial misconduct which adversely affects the public interest by impairing the efficiency of the public service." Doherty v. Civil Serv. Comm'n, 486 Mass. 487, 493 (2020), quoting Police Comm'r of Boston v. Civil Service Comm'n, 39 Mass. App. Ct. 594, 599 (1996). Such misconduct is generally understood to include misconduct at work, e.g., Doherty, supra at 489 (commission found just cause for discipline where employee was "rude" and "unprofessional" and charged with unsatisfactory performance), or a failure to perform duties or meet job requirements, see Cullen v. Mayor of Newton, 308 Mass. 578, 581 (1941) (civil service law permits "removal of those who have proved to be incompetent or unworthy to continue in the public service"). See also Nolan v. Police Comm'r of Boston, 383 Mass. 625, 630 (1981) (police department "has the authority and duty to determine a police officer's fitness to perform his duties or to return to full working status"). When reviewing civil service disciplinary actions, the civil service law mandates that the commission reverse an action of the appointing authority "if the employee, by a preponderance of evidence, establishes that said action was based . . . upon any factor or conduct on the part of the employee not reasonably related to

the fitness of the employee to perform in his position."  G. L. c. 31, § 43.

In determining whether the decision was based on improper factors, we must also recognize that the civil service law expressly mandates that decisions be consistent with "basic merit principles."  Massachusetts Ass'n of Minority Law Enforcement Officers v. Abban, 434 Mass. 256, 264 (2001) (fundamental purpose of civil service law is "to ensure decision-making in accordance with basic merit principles"). "Basic merit principles" include "assuring fair treatment of all applicants and employees in all aspects of personnel administration without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion and with proper regard for privacy, basic rights outlined in [G. L. c. 31] and constitutional rights as citizens" (emphases added).  G. L. c. 31, § 1.

Despite this express language directed at fair treatment of all employees regardless of race, the town contends that G. L. c. 151B provides the exclusive remedy to address the type of misconduct at issue.  This argument oversimplifies the relationship between the two statutes.  Chapter 151B specifically prohibits a broad range of discrimination in employment on the grounds of race, sex, sexual orientation, gender identity, national origin, disability, or religion.  See

G. L. c. 151B, § 4.  It "creates an administrative procedure for the enforcement of antidiscrimination statutes of the Commonwealth."  See Charland v. Muzi Motors, Inc., 417 Mass. 580, 582 (1994).  As relevant here, employees can bring a claim against their employer under c. 151B for a hostile work environment.  See College-Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination, 400 Mass. 156, 162 (1987) ("The discrimination prohibited by G. L. c. 151B, § 4 [1], encompasses a work environment pervaded by abuse and harassment").  An employee may also bring a claim of retaliation.  See, e.g., Psy-Ed Corp. v. Klein, 459 Mass. 697, 707 (2011) (employee has claim for retaliation under c. 151B where employee engaged in protected conduct, he or she suffered some adverse action, and causal connection exists between conduct and adverse action).[16]  Chapter 151B provides a

---

[16] Retaliation is a different claim from discrimination under G. L. c. 151B.  See Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky, & Popeo, P.C., 474 Mass. 382, 405 (2016).  "An employee bringing a retaliation claim is not complaining of discriminatory treatment as such, but rather of treatment that 'punish[es]' her for complaining of or otherwise opposing such discriminatory treatment."  Id., quoting Ruffino v. State St. Bank & Trust Co., 908 F. Supp. 1019, 1040 (D. Mass. 1995).  Therefore, a "claim of retaliation may succeed even if the underlying claim of discrimination fails, provided that in asserting her discrimination claim, the claimant can 'prove that [she] reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination'" (alterations in original).  Psy-Ed Corp., 459 Mass. at 706-707, quoting Abramian v. President & Fellows of Harvard College, 432 Mass. 107, 121 (2000).

comprehensive set of remedies that address discrimination, harassment, and retaliation, including those based on race.[17]

In this case we must determine how G. L. cc. 31 and 151B interact in cases involving civil service employees. Generally, "[i]n the absence of explicit legislative commands to the contrary, we construe statutes to harmonize and not to undercut each other." Ryan v. Mary Ann Morse Healthcare Corp., 483 Mass. 612, 620 (2019), quoting School Comm. of Newton v. Newton Sch. Custodians Ass'n, Local 454, SEIU, 438 Mass. 739, 751 (2003). We "attempt to interpret statutes addressing the same subject matter harmoniously, 'so that effect is given to every provision in all of them.'" Green v. Wyman-Gordon Co., 422 Mass. 551, 554 (1996), quoting 2B Singer, Sutherland Statutory Construction § 51.02, at 122 (5th ed. 1992). In fact, in an analogous context, we concluded that the existence of a distinct, but overlapping, statutory scheme permitted an aggrieved party to pursue a remedy under either the civil service law or the

---

[17] Both courts and the MCAD have broad authority to remedy c. 151B violations. G. L. c. 151B, § 5. The statute includes a nonexhaustive list of remedial actions that the MCAD can take, including "hiring, reinstatement or upgrading the employees, with or without back pay, or restoration to membership in any respondent labor organization." Id. See Stonehill College v. Massachusetts Comm'n Against Discrimination, 441 Mass. 549, 567, cert. denied sub nom. Wilfert Bros. Realty Co. v. Massachusetts Comm'n Against Discrimination, 543 U.S. 979 (2004). Damages are also available, including compensatory damages, front pay, emotional distress damages, and punitive damages.

related statute. See <u>Fernandes</u> v. <u>Attleboro Hous. Auth</u>., 470 Mass. 117, 126 (2014) ("Although both the civil service law and the Wage Act address wrongful conduct arising in the employment context, they have distinct purposes and, as a consequence, provide different remedies for the violation of their statutory mandates").

In the instant case, G. L. c. 151B provides specific guidance on how it interrelates with other statutes. General Laws c. 151B, § 9, provides:

> "This chapter shall be construed liberally for the accomplishment of its purposes, and any law inconsistent with any provision of this chapter shall not apply, but <u>nothing contained in this chapter shall be deemed to repeal any provision of any other law of this commonwealth relating to discrimination</u>; but, as to <u>acts declared unlawful</u> by [G. L. c. 151B, § 4], the administrative procedure provided in this chapter under [§ 5] shall, <u>while pending</u>, be exclusive; and the final determination on the merits shall exclude any other civil action, <u>based on the same grievance</u> of the individual concerned." (Emphases added.)

The language as to repeal and exclusivity is carefully drafted here. As the foregoing indicates, nothing about G. L. c. 151B was intended to repeal any portion of any existing law "relating to discrimination," which includes the civil service law protection against discharges without just cause and enforcement of basic merit principles.[18] Instead, G. L. c. 151B

---

[18] The civil service system has been in existence since at least 1884. See St. 1884, c. 320. "Race" was added to the definition of "basic merit principles" in 1981. See St. 1981,

proceedings are exclusive as to "acts declared unlawful" by c. 151B only when administrative proceedings are pending before the MCAD, or a final determination on the merits has been made "based on the same grievance." This prioritization regarding "acts declared unlawful by [G. L. c. 151B, § 4,]" makes sense given that G. L. c. 151B is designed specifically to address discrimination and provides a comprehensive remedial structure to rectify discrimination. See Green, 422 Mass. at 555 (G. L. c. 151B is "broad and comprehensive remedial scheme"). Here, however, Alston's only MCAD proceeding ended several years before he sought review of his termination with the commission. There was no proceeding pending under G. L. c. 151B, § 5, when Alston appealed from his termination to the commission. Therefore, neither § 9 nor G. L. c. 151B more broadly bar the commission from considering conduct related to discrimination when reviewing whether the town had just cause to terminate Alston.

Moreover, interpreting the civil service law in a way that permits the commission to consider racist or retaliatory statements and acts, and the municipality's improper response to those statements and actions, in the commission's just cause determination does not displace or undermine the purpose served

---

c. 767, § 10. General Laws c. 151B originally was enacted in 1946. See St. 1946, c. 368, § 4.

by G. L. c. 151B.  The just cause analysis may overlap with, but
remain different from, a determination of discrimination.  The
commission here focused on arbitrary and capricious decision-
making in response to the racist statement and apparently
retaliatory acts without making express findings of
discrimination or retaliation as defined by G. L. c. 151B.  It
need not do so to find a lack of just cause.[19]  Racist and
retaliatory acts, combined with an arbitrary and capricious
response by the employer, may be found to be sufficient to
support a determination that the discharge was unjustified.  A
civil service employee has greater job protection than most

---

[19] As the hearing officer explained:

"It is not necessary to conclude whether the Town violated
the state's anti-discrimination law to decide this appeal
and I have not attempted to do so here.  The Commission is
not mandated to function as an alternative to MCAD or the
Court as an adjudicator of the rights of those who have
experienced discrimination or retaliation in violation of
their civil rights or other laws.  However, when a civil
service appointing authority commits acts which are
fundamentally unfair and fall within the penumbra of the
prohibited conduct of those laws, it is appropriate for the
Commission to take notice of that misconduct in order to
fulfil the statutory mandate to assure 'fair treatment' of
civil service employees, free from 'arbitrary and
capricious' acts, 'without regard' for an employee's 'race'
or other protected status, and 'with proper regard' for
civil service law and an employee's 'constitutional rights,
as citizens.'  G. L. c. 31, § 1."

other employees as reflected in the just cause provision, and additional procedural and job-specific rights.[20]

From the foregoing, it is clear that the commission's mandate is to protect civil service employees from termination from employment for reasons that violate basic merit principles. As most relevant here, the commission may determine that an employee has been subject to, and rendered unfit by, racist and retaliatory acts and an arbitrary and capricious response to those acts by the municipality. See Malloch v. Hanover, 472 Mass. 783, 799-800 (2015) (promotion and bypass decision tainted by gender bias would violate basic merit principles). The commission can further determine that, in these circumstances, termination of such an employee violates basic merit principles. More specifically, the commission may find that the employer is responsible for the intolerable workplace conditions, including racist and retaliatory acts, that have rendered the employee unfit to perform his or her duties and resulted in the employee's discharge, and therefore the employee's unfitness is not just cause for his or her termination. Cf. Salvi v. Suffolk County Sheriff's Dep't, 67 Mass. App. Ct. 596, 606-607 (2006)

---

[20] We need not decide today to what extent a decision on the merits rejecting a claim of discrimination under G. L. c. 151B by either the MCAD or a court would have preclusive effect on the commission's ability to consider discriminatory conduct as part of its analysis as to whether a municipality had just cause.

(homophobic slurs, shunning, and inappropriate corrective action resulting in intolerable workplace conditions and deterioration of employee's mental health found to constitute constructive discharge).  Rather, the intolerable workplace environment that the municipality created or sustained is the cause of the employee's unfitness and unjust termination.  Cf. GTE Prods. Corp. v. Stewart, 421 Mass. 22, 34 (1995) (where employee resigns because of work environment created by employer that is "so difficult as to be intolerable," resignation treated as if employer terminated employee); Salvi, supra.  To reiterate, in making this determination, the commission has the authority to hear evidence and make findings based on the types of discriminatory and retaliatory statements and actions that are proscribed by G. L. c. 151B.[21]

The town also argues that the commission is barred by claim preclusion and issue preclusion.  The town argues that Alston previously litigated his claims in the Norfolk litigation, and the judge's dismissal in that case bars Alston from relitigating his allegations of discrimination in this case.  "Claim

---

[21] The town relies on our decision in Charland, 417 Mass. at 586, in which we held that "where applicable, G. L. c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections." As we have explained, however, Alston did not bring an employment discrimination claim against the town; rather, he contested whether the town had just cause to terminate him from his position.

preclusion makes a valid, final judgment conclusive on the parties and their privies, and prevents relitigation of all matters that were or could have been adjudicated in the action." DeGiacomo v. Quincy, 476 Mass. 38, 41 (2016), quoting Kobrin v. Board of Registration in Med., 444 Mass. 837, 843 (2005). "[C]laim preclusion requires three elements:  '(1) the identity or privity of the parties to the present and prior actions, (2) identity of the cause of action, and (3) prior final judgment on the merits.'"  DeGiacomo, supra, quoting Kobrin, supra.

On the other hand, "[i]ssue preclusion 'prevents relitigation of an issue determined in an earlier action where the same issue arises in a later action, based on a different claim, between the same parties or [parties in privity with the same parties].'"  DeGiacomo, 476 Mass. at 42, quoting Kobrin, 444 Mass. at 843.  "A party is precluded from relitigating an issue where '(1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication,' was essential to the earlier judgment, and was actually litigated in the prior action."  DeGiacomo, supra, quoting Kobrin, supra.

The judge below concluded that claim preclusion did not apply because Alston was not raising claims under G. L. c. 151B

as he had in the Norfolk litigation.  Similarly, the judge concluded that the Norfolk litigation did not determine any facts, and therefore, issue preclusion did not apply.

We agree that neither claim nor issue preclusion applies here.  Claim preclusion clearly is inapplicable, as the two actions involve different claims.  The Norfolk litigation involved claims under G. L. c. 151B; the present case involves a challenge to Alston's termination under G. L. c. 31, §§ 41 and 43.

Issue preclusion also does not apply.  Even if an identical issue could be identified, which is doubtful here,[22] "issue preclusion can be used only to prevent relitigation of issues actually litigated in the prior action" (emphasis added).  Kobrin, 444 Mass. at 843-844.  There is no indication that the parties actually litigated the issues of discrimination and retaliation, as the case was dismissed as a discovery sanction.

---

[22] The Norfolk litigation involved allegations of racial discrimination based on the voicemail and subsequent acts of retaliation prior to 2014; the present litigation involves a challenge to the town's termination of Alston without just cause in 2016.  Although the pre-2014 discriminatory and retaliatory acts figured into the 2016 analysis, as discussed supra, the issue whether the town discriminated against Alston under G. L. c. 151B prior to 2014 is different from whether the town had just cause to terminate Alston in 2016 under G. L. c. 31, § 41.  Thus, although the two cases involve some of the same underlying facts, the issues in each case appear to be distinct.  See Kobrin, 444 Mass. at 843 (no issue preclusion where issues not identical).

     b.  Substantial evidence.  The decision of the commission

"will be upheld unless it is 'unsupported by substantial

evidence[,] . . . arbitrary or capricious, an abuse of

discretion, or otherwise not in accordance with the law.'"

Boston Police Dep't v. Civil Serv. Comm'n, 483 Mass. 461, 469

(2019), quoting G. L. c. 30A, § 14 (7).  "Substantial evidence

is 'such evidence as a reasonable mind might accept as adequate

to support a conclusion.'"  Boston Police Dep't, supra at 474,

quoting G. L. c. 30A, § 1 (6).  Importantly, we "give due weight

to the experience, technical competence, and specialized

knowledge of the agency, as well as to the discretionary

authority conferred upon it."  G. L. c. 30A, § 14 (7).  "This

standard of review is highly deferential to the agency on

questions of fact and reasonable inferences drawn therefrom."

Flint v. Commissioner of Pub. Welfare, 412 Mass. 416, 420

(1992).  Accordingly, as the party challenging the commission's

order here, the town "bears a heavy burden."  Spencer v. Civil

Serv. Comm'n, 479 Mass. 210, 215 (2018).

     We begin with the commission's summary of its decision,

which clearly and concisely encapsulates its findings of fact

and legal analysis:

     "A white Brookline Fire Lieutenant made the racist comment
     'fucking [n-word]' to describe a motorist who the
     lieutenant believed to be black or Hispanic.  That racist
     comment inadvertently ended up on the voice mail of the

lieutenant's employee, Gerald Alston, an African American firefighter in the Brookline Fire Department.

"Town officials responded with a minor, short-term suspension of the lieutenant followed by his almost-immediate promotion.  Thereafter, Town officials:  granted further promotions of the lieutenant; failed to prevent retaliatory behavior against Firefighter Alston; and enabled the lieutenant to use his position to lobby many other members of the force against Firefighter Alston and paint himself as the victim.

"These actions by the Town were arbitrary, capricious, and in violation of Firefighter Alston's rights under the civil service law to be treated fairly '. . . without regard to political affiliation, race, color, age, national origin, sex, marital status, handicap, or religion and with proper regard for . . . basic rights outlined in [the civil service law] and constitutional rights as citizens . . . .' G. L. c. 31, § 1.  The Town's own actions and inactions were the reasons that made it impossible for Firefighter Alston to return to work, which formed the basis of the Town's decision to terminate his employment.

"When a municipality's own violation of a tenured employee's rights has prevented the employee from returning to work, as here, the Town cannot use that inability to work as just cause for discharging the employee from his tenured position."

We conclude that there is substantial evidence to support this decision; it is also a correct statement of the law.  For these reasons, we affirm.

Beginning with the original incident, the commission's findings show that the board's handling of the use of racist language by Pender was woefully deficient and insensitive given the concerns raised by Alston about racist behavior and retaliation.  As the commission explained:

"The Town's failure to respond to the report of the racial
epithet in a timely manner; their failure to impose a
proper level of discipline; and their decision to
repeatedly promote Mr. Pender showed that the Town failed
to comprehend the seriousness of Mr. Pender's use of the
racial epithet and the damaging impact it had on
Firefighter Alston."

Not only did it take weeks for the department to begin

investigating the incident, but the board also then failed to

conduct any meaningful inquiry into the incident, instead

conducting what the commission described as "an informal

discussion" with Pender and his attorney.[23]  It also disregarded

---

[23] We emphasize today what should no longer need to be said
in 2021 -- the use of "n----r" has absolutely no place in any
workplace environment in the Commonwealth, including among those
subject to the civil service laws.  The Appeals Court has
previously condemned the use of "n----r" in this context.  See
Green v. Harvard Vanguard Med. Assocs., 79 Mass. App. Ct. 1, 8
(2011) (phrase "fucking [n----r]" is "disgusting, demeaning, and
humiliating" and use of words and their "impact upon those to
whom they are directed . . . is a grave matter"); Augis Corp. v.
Massachusetts Comm'n Against Discrimination, 75 Mass. App. Ct.
398, 409 (2009) ("[This slur] inflicts cruel injury by its very
utterance.  It is degrading, it is humiliating, and it is
freighted with a long and shameful history of humiliation, the
ugly effects of which continue to haunt us all.  The words have
no legitimate place in the working environment -- indeed, they
have no legitimate place -- and there is no conceivable
justification for their use by a workplace supervisor").  Other
courts have echoed these sentiments, emphasizing how harmful the
word is.  See, e.g., Ayissi-Etoh v. Fannie Mae, 712 F.3d 572,
580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (term "sums up
. . . all the bitter years of insult and struggle in America"
[citation omitted]); Hrobowski v. Worthington Steel Co., 358
F.3d 473, 477 (7th Cir. 2004) (courts "recognize that the [slur]
can have a highly disturbing impact on the listener"); Spriggs
v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) ("[f]ar
more than a mere offensive utterance," term is "pure anathema to

the disciplinary recommendation of the chief of the department at the time and gave Pender a more lenient punishment.

That Pender was promoted almost immediately after serving his suspension further compounded the initial failures. Alston was shocked by Pender's promotion because he had been assured by the chief that Pender would not be promoted. The town and the department have attempted to justify this promotion by arguing that it was automatic because Pender was at the top of the civil service list and that it was temporary. As the commission emphasized, candidates at the top of the list easily can be passed over provided reasonable justification exists. See Sherman v. Randolph, 472 Mass. 802, 804 (2015) ("Candidates at the top of the list . . . may be bypassed if the appointing authority chooses a candidate lower on the eligibility list based on reasonable justification"). The town or the department clearly had such justification here given Pender's recent actions.

Thereafter, Pender was promoted at least two more times, further compounding Alston's sense that racism in his workplace was not being addressed. As the commission emphasized:

"After being promoted, Mr. Pender used his position as Captain of Training to tell his 'side of the story'

African-Americans" [quotation omitted]); Monteiro v. Tempe Union High Sch. Dist., 158 F.3d 1022, 1034 (9th Cir. 1998) ("the most noxious racial epithet in the contemporary American lexicon").

regarding the incident to all new recruits, telling them that what they read in the local paper about this matter was 'a bunch of lies.' . . .  This was not a momentary misstatement by Mr. Pender.  Rather, both at the time, and years later, he would repeatedly make comments suggesting that his racist comment was overblown and, in turn, that Firefighter Alston had overreacted to the racist comment. Most troubling is that, over a period of years, Mr. Pender would reinforce that message to every new recruit of the Brookline Fire Department."

The commission also described numerous instances of retaliatory behavior in the ensuing months and years that the town failed to investigate or discipline properly.  The town did nothing to investigative the union blog post -- which minimized the racist comment and retaliated against Alston for reporting it -- aside from asking that it be removed.  It also did nothing when Pender himself handed the town transcripts of conversations with Alston in which he "attack[ed]" Alston's decision to report the incident.  When referring to Pender's comments to Alston regarding his decision to report the incident, the commission observed that "[i]t is difficult to imagine a more stressful situation for an employee than when a supervisor, who had recently made a racist comment, is now attacking the employee for reporting it."  Similarly, the commission identified a number of ways in which it found that the town acted in bad faith.  One example was the town's unfounded, if not farcical, suggestion in its official investigative report of the incident that "Leave" could have been written by a fraternity member or a

passerby despite "there [being] no evidence to establish this scenario occurred."

The commission also pointed to evidence from the members of the board.  Its findings show that "[d]uring the public comment session, Town officials and employees repeatedly referenced the remorse and apologies of Mr. Pender and appeared to explicitly call out Firefighter Alston for his inability to 'move on,'" ignoring that "Pender had, on multiple occasions, verbally attacked Firefighter Alston for reporting the incident and repeatedly minimized his misconduct to fellow firefighters, including all new recruits," and that other members of the department had engaged in retaliatory behavior against Alston in support of Pender.

The commission also made findings regarding the effect of these actions on Alston:  "After reviewing all of the evidence, including the testimony of Firefighter Alston, [the commission has] concluded that Mr. Pender's use of the racial epithet 'fucking [n----r],' coupled with subsequent actions and inactions by Town officials at all levels, which compounded the racist comment into an avalanche of unfair, arbitrary, capricious and retaliatory behavior that infringed on Firefighter Alston's civil service rights, made it impossible for him to perform his job as a Brookline firefighter."  More particularly, the commission credited the expert testimony from

42

Price to the extent that she concluded that "hearing a racial slur from a Lieutenant he trusted was especially troubling to Firefighter Alston because it called into question how he was really perceived by his fellow firefighters and raised concern about whether others would have his back in dangerous situations." Furthermore, the commission adopted the expert's determination that "Alston developed psychological symptoms in response to hearing the racial slur from his Lieutenant" and that Alston was diagnosed properly in 2015 with adjustment disorder. The commission did not, however, "find that the evidence supported [Price's] conclusion that Firefighter Alston would be able to return to work upon meeting the conditions outlined in her report." The commission rejected this part of her testimony because "she simply did not have the benefit of the entire record that was presented to the Commission through two hundred eighty (280) exhibits and fourteen (14) witnesses over ten (10) days of hearing."

In light of these findings, we conclude that there is substantial evidence to support the commission's determination that the town acted arbitrarily and capriciously and in violation of "Alston's rights under the civil service law to be treated fairly 'without regard to . . . race.'" Considering Pender's racist comment, the retaliatory actions, and the town's continuously insensitive and inappropriate, if not outright

discriminatory, responses, the commission's findings constitute "such evidence as a reasonable mind might accept as adequate to support" the conclusion that the town caused Alston's unfitness preventing his return to work. See G. L. c. 30A, § 1 (6). Cf. Salvi, 67 Mass. App. Ct. at 606-607.

The town makes several arguments why the commission's conclusion was not supported by substantial evidence. First, the town argues that the conclusion that Alston was prevented from returning to work was erroneous because the commission's findings demonstrate that the town terminated Alston after his absence from work for nearly two and one-half years and his failure to participate in the return to work process. This argument ignores the key conclusion of the commission -- that Alston's inability to work was caused by the town's actions and inactions. This is also the type of difficult, fact-specific determination that requires deference to the commission if it is supported by substantial evidence. As we explained in Labor Relations Comm'n v. University Hosp., Inc., 359 Mass. 516, 521 (1971):

> "A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo. The judicial inquiry is limited to a determination whether within the record which was before the Commission and which it has sent to the court for review there is 'such evidence as a reasonable mind might accept as adequate to support' the Commission's conclusion . . . . If there is, the action of the

> Commission must be affirmed even though the court would have reached a different result if it were originally in the position of the Commission." (Citations omitted.)

The town does not dispute the findings on which the commission based its decision. It simply argues that the commission should have reached a different conclusion about Alston's ability to return to work and the causes thereof based on those findings.

To be sure, much of the conduct that the town points to as evidence of Alston's lack of fitness is also supported by evidence in the record. Alston's extended absence from work, his drug use and mental health concerns, and his steadfast refusal even to meet with or speak to members of the department on the return to work process present serious concerns, especially for public safety workers, and provide justification for discipline or even termination from employment in other circumstances, where the commission has not found racist and retaliatory conduct in the workplace and that the employer's arbitrary and capricious responses to such conduct, all in violation of merit principles, rendered the employer responsible for such absences, drug use, or mental health problems. We read the commission's decision here, in the context of the highly unusual facts of this case and Alston's particular mental illness, to excuse noncompliance with attendance and cooperation requirements. That is not to say, however, that illegal drug use, or a failure to participate in a reasonable return to work

process, would not be just cause for discipline or termination under different circumstances.

Ultimately, however, it is the job of the commission, not this court, to weigh the evidence before it and determine whether a municipality had just cause to terminate an employee. Our review is simply to determine whether the commission's decision is supported by substantial evidence. See Brackett v. Civil Serv. Comm'n, 447 Mass. 233, 241 (2006). See also Boston Police Dep't, 483 Mass. at 476. Here, the commission's essential findings are supported by evidence in the record. The commission provided detailed findings supporting its conclusion that racist comments and retaliatory actions and arbitrary and capricious responses by the town in violation of merit principles rendered Alston unfit and that there was not just cause for his discharge despite lack of cooperation with conditions imposed by the town. The town therefore has not carried its burden to demonstrate that the commission's decision was not supported by substantial evidence.

The town raises one more specific issue that we must address. It argues that the commission unlawfully substituted its judgment for that of Price, who concluded that Alston could return to work if he met several conditions. The town argues that agencies are permitted only to "take notice of general, technical or scientific facts within their specialized

knowledge." G. L. c. 30A, § 11 (5). As the fact finder, however, the commission was free to credit portions of Price's expert opinion and disregard others. Police Dep't of Boston v. Kavaleski, 463 Mass. 680, 694 (2012), quoting School Comm. of Brockton v. Massachusetts Comm'n Against Discrimination, 423 Mass. 7, 15 (1996) ("The commission . . . is the sole judge of the credibility and weight of the evidence before it"). See also Boston Police Dep't, 483 Mass. at 474 & n.24 (court defers to commission's credibility determinations and factual findings, including assessment of expert evidence).

Moreover, it was appropriate for the commission to reject portions of Price's report because it found that she was not aware of, or did not incorporate into her report, several important considerations that were presented to the board during the evidentiary hearing. See Kavaleski, 463 Mass. at 694 ("The commission was entitled to discredit [an expert's] assessment of Kavaleski even though Kavaleski offered no expert testimony of her own. . . . The commission properly explained on the record its reasons for rejecting portions of [the expert's] testimony"). Specifically, the commission found that Price was not aware of the following additional information: the town's failure to comprehend the seriousness of Pender's use of "n----r" and failure to take the necessary steps to repair the damage caused by Pender; the town's enabling of retaliatory behavior

against Alston by Pender and others and allowing Pender to paint himself as the victim; and the town's attacks on Alston's credibility "that appeared to lack bona fides and proper regard for fundamental fairness and good faith."  The commission juxtaposed the extensive record it compiled over the course of a ten-day hearing with the more limited and mostly documentary information provided to Price by the town.[24]  The commission also offered detailed support based on its findings justifying each of these conclusions and explaining its deviation from Price's conclusions.  There was therefore no error in the board's decision to diverge from Price's conclusion that Alston could return to work if several conditions were met.

c.  Remedy.  All that remains is determining the proper remedy for Alston's improper termination.  The statute is unequivocal:  G. L. c. 31, § 43, states, "If the commission by a preponderance of the evidence determines that there was just cause for an action taken against such person it shall affirm the action of the appointing authority, otherwise it shall reverse such action and the person concerned shall be returned to his position without loss of compensation or other rights . . ." (emphasis added).  See Malloch, 472 Mass. at 788, quoting

_____

[24] For example, the 2016 hearings at which Pender's promotion was considered and to which the commission pointed numerous times occurred well over one year after Price evaluated Alston.

Thurdin v. SEI Boston, LLC, 452 Mass. 436, 444 (2008) ("where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent"). This express and specific language is controlling. Therefore, we conclude that once the commission concluded that the town lacked just cause to terminate Alston, the commission was statutorily required to order Alston's reinstatement.

The town argues nonetheless that an order to reinstate an unfit firefighter to the payroll and roster without a requirement that he actually work is beyond the commission's jurisdiction, as it is essentially an order for the town to pay for leave for an indefinite time. The problem with the town's argument is that the town has been found responsible by the commission for Alston's unfitness. The town cannot render him unfit, and then refuse to rehire or pay him.[25]

---

[25] We recognize that G. L. c. 151B includes a variety of remedies for discrimination, providing for a more flexible response to discrimination in the work force. This helps explain why G. L. c. 151B provides the exclusive remedy when there is a pending claim of discrimination or a decision on the merits on the discrimination claim. Ordering Alston to return to a work environment in which he cannot currently work is far from ideal. Nevertheless, reinstatement is the remedy dictated by the civil service law. We do note that the commission suggests in its briefing that the town may have the option of pursuing involuntary disability retirement on behalf of Alston under G. L. c. 32, § 16. Our holding, however, is simply that the civil service law requires Alston's reinstatement, and we express no opinion as to what options the town or Alston may have going forward.

4. <u>Conclusion</u>.  For the foregoing reasons, the judgment affirming the decision of the Civil Service Commission is affirmed.

<u>So ordered</u>.